## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CR-14027-ROSENBERG/MAYNARD

**UNITED STATES OF AMERICA,**

**v.**

**BLAINE HULTEN,**

     **Defendant.**

_____/

### REPORT AND RECOMMENDATION ON
### DEFENDANT'S MENTAL COMPETENCY TO STAND TRIAL

**THIS CAUSE** is referred to me for a recommendation on Defendant Blaine Hulten's competency to stand trial. Defendant is charged by Indictment with enticement of a minor to engage in sexual activity, production of child pornography, and distribution of child pornography. DE 1. On November 29, 2023, Defendant filed an unopposed motion for mental competency hearing. DE 52. Presiding District Judge Robin L. Rosenberg referred the motion to me. DE 53. I granted Defendant's motion and held a competency hearing on April 12, 2024. DE 59, DE 64.

Throughout this case, several experts have evaluated Defendant and have reached divergent conclusions as to his competency. Having carefully considered the expert reports, the expert hearing testimony, the testimony of the defense witnesses, the exhibits, the argument of counsel, and the applicable law, for the reasons explained below, I find that Defendant has a rational and factual understanding of the proceedings against him, and a sufficient present ability to consult with his counsel with a reasonable degree of rational understanding. I thus respectfully **RECOMMEND** that the Court find Defendant is presently competent to stand trial.

**BACKGROUND**

On March 27, 2022, a woman contacted the Martin County Sheriff's Office to report that an adult male was texting her minor daughter asking for sex through a social media application. According to the Government, the investigation revealed that Defendant engaged in sexual contact with two minor females, ages 16 and 13, produced video recordings of the sexual acts, disseminated the recordings via a social media messaging service, sent the minors sexually explicit images, and asked the minors to send explicit pictures or videos to him.

On April 14, 2022, state authorities arrested Defendant on a state court arrest warrant issued in Martin County, Florida the day before.  On May 5, 2022, Defendant was indicted federally with two counts of enticement of a minor in violation of 18 U.S.C. § 2422(b); one count of production of visual depictions involving sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a) and (e); and one count of distributing visual depictions involving sexual exploitation of a minor in violation of 18 U.S.C. § 2252(a)(2) and (b)(l).  DE 1.  On May 13, 2022, Defendant had an initial appearance before me in federal court.  DE 5.

Shortly thereafter, defense counsel raised the issue of Defendant's competence to stand trial. Defendant was evaluated twice by Dr. Sheila K. Rapa and once by Dr. Tiffany K. Smith at the Federal Bureau of Prisons.  As detailed further in my factual findings below, Dr. Rapa initially found Defendant incompetent to proceed but later found him competent to proceed following Dr. Smith's finding that Defendant was competent to proceed.

Following these evaluations, the parties stipulated to Defendant's competence to proceed and a change of plea hearing was set for December 7, 2023.  DE 38, DE 51.  A week before the hearing, however, defense counsel filed a second motion regarding Defendant's competency citing Defendant's "increasingly odd behaviors, including espousing a belief he could control the outcome of his case using astrology."  DE 52 at 3.  According to this motion, Dr. Rapa re-evaluated Defendant

for a third time on November 24, 2023 and determined that Defendant had "suffered a significant psychotic break" rendering him "no longer competent to proceed." *Id.* In response, the Government hired Dr. Michael P. Brannon to evaluate Defendant's competency and Dr. Brannon concluded that Defendant was malingering and was competent to proceed. DE 69-2.

I held a competency hearing on April 12, 2024. The Government called Dr. Smith and Dr. Brannon as witnesses and introduced their reports into evidence (Govt. Exhibits 1 and 2, respectively). Defendant called Dr. Rapa, Kyle Alders (Defendant's brother), and Erika Warren (Defendant's mother) and introduced Dr. Rapa's curriculum vitae and reports (Defense Exhibits 1, 2, 16, and 17), Defendant's jailhouse mental health records from 12/7/23 to 1/18/24 (Defense Exhibits 3 through 13), Defendant's journal (Defense Exhibit 14), and Defendant's letters to his mother (Defense Ex. 15). All exhibits were admitted without objection. The matter is ripe for review.

## FINDINGS OF FACT

### A. Defendant's General Background

Defendant is a 23-year-old male, born and raised in West Palm Beach, Florida. Govt. Ex. 2. His biological parents divorced when he was a child, and his mother and stepfather raised him. Defendant's mother reported that Defendant was delayed in several developmental milestones and diagnosed with Asperger's Disorder (or ASD) at age 16. He finished school online after being expelled. Defendant has limited employment history, which includes working at a morgue for a couple of months with his brother, at a BurgerFi restaurant for five months at age 16, at a Little Caesars' pizza restaurant for a year when he was 18, and at a warehouse beginning at age 20 until just before his arrest. Govt. Ex. 1 at 4. Defendant's substance use history includes alcohol (weekly), marijuana (daily), cocaine (weekly in 2020 and 2021), Klonapin (2021), and hallucinogenic substances (infrequently). *Id.* at 5. Prior to his current charges, Defendant had never been arrested. His only known diagnoses were autism spectrum disorder and bipolar disorder, for which he was

prescribed psychotropic medication (including, at various times, Haldol, Lithium, and BuSpar).  *Id.* at 6-7, Govt Ex. 2 at 5.

**B.  Defendant's Recorded Jail Calls**

On his arrest date of April 14, 2022, Defendant called his mother on a recorded line from the Martin County jail and told her he was "probably gonna be here the rest of [his] life."  He then stated, "I mean, we play the mental card here cuz …".  Defendant's mother interrupted him, but he continued, saying "I'm not even joking though."  Govt Ex. 1 at 8; DE 76 at 2.  The next day in another recorded call Defendant told his mother that he needed a privately paid attorney.  He said that a public defender would not "help," and he needed private counsel due to the seriousness of his charges.  Govt Ex. 1 at 8; Govt Ex. 2 at 7.  Defendant displayed no communication difficulties during these phone calls.  *Id*.

**C.  The Experts' Views on Defendant's Competency**

At the hearing, I recognized Drs. Rapa, Smith, and Brannon as experts in forensic psychology. Below are summaries of the various competency evaluations of Defendant in chronological order.

<u>**Dr. Rapa's 6/26/2022 Evaluation**</u>

Dr. Rapa first evaluated Defendant on June 27, 2022.  Def. Ex. 16.  She administered the Autism Spectrum Screening Questionnaire and Miller-Feigning Assessment of Screening Test ("M-FAST"), which is a structured interview that assesses an individual's probability of malingering.  *Id*. at 4.  The M-FAST demonstrated no evidence of malingering.  In her written report, Dr. Rapa opined that Defendant could not fully appreciate the legal process or assist in his defense due to his diagnosis of autism spectrum disorder ("ASD") and his lack of experience with the criminal justice system.  *Id*. at 6; DE 73 at 76.  In Dr. Rapa's view, Defendant needed to be psychiatrically stabilized through medication and educated on the court process in general and his charges in particular before he would be competent to proceed.  *Id.*

Dr. Rapa confirmed at the hearing that her observations of Defendant confirmed his historical diagnosis of ASD.  Tr. 148.  Dr. Rapa "went back and forth" on whether Defendant was competent because she did not see any psychosis or "significant psychological disorder."  *Id*.  She did, however, believe Defendant needed "some teaching … about the legal system."  *Id*.; Def. Ex. 2.  She noted that Defendant was "very anxious," "did not know a whole lot about the legal process," and "got very confused about the legal process easily."  Tr. 148.  Ultimately, she found that Defendant was incompetent due to his ASD and needed specific competency training by a professional experienced in working with individuals with ASD.  Def. Ex. 16 at 6.

### Dr. Smith's 9/2022 – 11/2022 Evaluation

Defendant was sent to the Federal Bureau of Prisons ("BOP") Metropolitan Detention Center in Los Angeles, California ("MDC-LA") for a court-ordered competency evaluation. Dr. Smith evaluated Defendant at MDC-LA between September and November 2022.  Govt. Ex. 1.  Dr. Smith conducted at least four formal evaluation sessions and multiple informal sessions with Defendant. Dr. Smith and her team obtained Defendant's full bio-psychosocial history; reviewed prior mental health records and case related discovery; asked Defendant legally focused questions; and administered psychological testing.  Dr. Smith also reviewed Defendant's recorded phone calls and medical records while at BOP, consulted with medical and other correctional services staff, and observed Defendant while in the housing unit.  Despite Defendant's historical diagnosis of ASD, Dr. Smith noted that Defendant did not appear to have any significant difficulties with expressive or receptive language, *i.e.* speaking or understanding.  He was able to offer relevant and meaningful information regarding both historical data and legal matters and provided appropriate responses during the evaluations.

Dr. Smith did not see signs or symptoms warranting a diagnosis from the DSM-V during the three months that Defendant was at MDC-LA, but she retained his historical ASD diagnosis since

ASD is primarily determined by developmental history and functioning.  Tr. 22.  Despite his ASD diagnosis, Dr. Smith observed no language, social, or emotional deficits.  *Id.*  She also saw no impairment with Defendant's nonverbal communication or any personality-related difficulties with Defendant's ability to develop or maintain relationships.  *Id.* at 23.  Other than fiddling with his hand restraints during interviews, Defendant also did not demonstrate any restrictive or repetitive behaviors.  *Id.*

Dr. Smith and her team administered the following psychological tests to Defendant: (i) Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"); (ii) Personality Assessment Inventory ("PAI"); and (iii) Revised Competency Assessment Instrument ("RCAI").  *Id.* at 1.  The WAIS-IV is considered the most valid measure of overall cognitive ability and yields a Full-Scale Intelligence Quotient ("FSIQ") and four index scores regarding verbal comprehension, perceptual reasoning, processing speed, and working memory.  *Id.* at 11.  Defendant's overall IQ score on the WAIS-IV fell within the average range, and his index scores fell within the average to high range.  Tr. 18.  The PAI is a self-administered objective test of personality and psychopathology designed to provide information on critical variables that are central in treatment planning and evaluation. Govt. Ex. 1 at 12.  Defendant's PAI responses suggested that he may have been responding indiscriminately, randomly, and/or may have been attempting to appear more impaired than he was, so the test was deemed invalid.  Tr. 19; Govt. Ex. 1 at 12.

The RCAI is a structured interview with 14 different components that helps guide an evaluator in determining the participant's understanding of the legal charges and process.  Govt. Ex. 1 at 16.  It asks questions about the charges, potential consequences, court proceedings, court players, and the meaning of terms like probation, plea agreement, guilty, not guilty, and guilty by reason of insanity. It also asks specific questions about a participant's ability to work with his attorney.  Defendant's RCAI responses demonstrated an overall adequate understanding of the criminal charges and the

related court proceedings.  Tr. 24-25; Govt. Ex. 1 at 16.  Defendant could spontaneously identify the pleas of guilty and not guilty as options, and he was able to give the examiner a penalty range that was consistent with his charges.  Defendant understood the concept of a plea of not guilty by reason of insanity; could describe the roles of the judge, the prosecutor, and the defense attorney; and he behaved in a way suggesting he could assist his defense attorney in his case. Based on the evaluations and other information available to her, Dr. Smith found Defendant competent to stand trial.  Tr. 24-27; Govt. Ex. 1 at 18.

### Dr. Rapa's 1/31/2023 Evaluation

On January 31, 2023, Dr. Rapa re-evaluated Defendant after he returned from MDC-LA.  Def. Ex. 17.  In Dr. Rapa's view, Defendant demonstrated "sufficient understanding of legal factors" and even "asked pertinent questions regarding the [legal] process." *Id*. at 2.  She observed Defendant discuss his case with his attorney and noted that Defendant asked good questions, understood his case, and appeared rational and goal oriented.  Dr. Rapa reiterated Defendant's inexperience with the legal system but found that Defendant had "educated himself" since her last evaluation, learning from his counsel and "others in similar situations." *Id*.  His autism was "still there of course, but in terms of what he knew and his knowledge, how he was able to express it was very good." Tr. 151.  Following this second evaluation, Dr. Rapa agreed with Dr. Smith's conclusion that Defendant was competent to proceed. *Id*.

### Dr. Rapa's 11/24/2023 Evaluation

Two weeks before Defendant was set to plead guilty, Dr. Rapa again evaluated Defendant on November 24, 2023.  According to Dr. Rapa's report from this third evaluation, Defendant exhibited auditory hallucinations; extreme, fixed delusions; and severe conceptional disorganization during his meeting with Dr. Rapa.  DE 55-2 at 8.  Dr. Rapa diagnosed Defendant with schizophreniform disorder,

which is schizophrenia lasting less than six months, and concluded that he was not competent to proceed. *Id.* at 8-9.

Dr. Rapa administered the (i) Positive and Negative Syndrome Scale ("PANSS"), (ii) Becks Cognitive Insight Scale ("BCIS"); and (iii) M-FAST. *Id*. at 11-12. The PANNS measures the severity of symptoms in patients with schizophrenia. Defendant fell within the "markedly ill range." DE 73-1 at 11. The BCIS is used to understand patients' perspectives about their anomalous experiences, attributions, and aberrant interpretations of specific life events. Defendant demonstrated "low insight into his psychotic processing." DE 73-1 at 11. Defendant's responses on the M-FAST demonstrated no evidence of malingering. [1] *Id*. at 11.

According to Dr. Rapa's hearing testimony, during this third evaluation, "[t]he Mr. Hulten that walked into the room to meet with [Dr. Rapa] was not the same Mr. Hulten that [she] had seen the last two times." Tr. 154. Defendant appeared dirty and disheveled. He was trembling and pacing back and forth. He had a journal with him that contained bizarre ramblings, including about his court case and astrology. *Id.* at 155. He told Dr. Rapa that he was John the Baptist, that he had special powers, and that he could predict the future. Dr. Rapa described his speech as

> [e]xtremely rapid throughout the two and a half hours, not a break for me to get him to stop talking. For me to ask something, was extremely difficult. Pulling him back on task was extremely difficult, and even if he was back on task for a little while, he would slip right back in to talking about his delusions.

*Id.* at 156.

Dr. Rapa emphasized her certainty that Defendant was not faking his symptoms:

> When he was with me, there was no way that this was faked. I don't think a human being in their rational logical mind could even make up what he was saying and how he was saying it, and how he would jump from topic to topic. To me it was absolutely legitimate whether it was

---

[1] Dr. Rapa testified that while she was able to complete the M-FAST with Defendant, she could not complete further objective testing with him due to his psychosis. Tr. at 161.

> a brief psychotic episode or mania, but it was legitimate, that two hours
> and a half were exhausting.

Tr. 158.  In terms of diagnosis, Dr. Rapa was unsure if what she saw was "just mania," or "a first

episode psychosis, somebody that was just really having a psychotic break." Tr. 157.  She ultimately

diagnosed Defendant with schizophreniform disorder, or schizophrenia lasting less than six months,

and concluded Defendant was not competent to proceed based on his severe psychotic symptoms.

Def. Ex. 3 at 9.

### Dr. Brannon's 11/2023 and 1/2024 Evaluations

On December 21, 2023 and January 10, 2024, Dr. Brannon evaluated Defendant.  Govt. Ex.

2.  In connection with his competency evaluation, Dr. Brannon reviewed the Indictment, Defendant's

journal, Dr. Rapa's reports, Dr. Smith's report, recordings of Defendant's jailhouse calls, and

Defendant's jailhouse medical records.  *Id*. at 3.  Dr. Brannon administered (i) the Structured

Interview of Malingered Symptomatology ("SIMS"); (ii) the Minnesota Multiphasic Personality

Inventory – Third Edition ("MMPI-3"); (iii) the M-FAST; and (iv) the Inventory of Legal Knowledge

("ILK").  *Id*.  The SIMS is a screening assessment for possible exaggeration of mental health

symptoms and Defendant's SIMS scores indicated malingering.  *Id.* at 4.  The MMPI-3 is a personality

test which assesses symptoms of mental health disorder in validity and clinical scales.  *Id*.

Defendant's MMPI-3 validity scales revealed a "significant elevation for infrequent psychopathology

response," which suggests an attempt to "fabricate symptoms of a mental health disorder."  *Id*.  Due

to the elevation, Defendant's MMPI-3 clinical scales were "not interpretable."  *Id*.  Defendant's M-

FAST score demonstrated evidence of malingering.  *Id.*  The ILK tests for possible feigning in

competency evaluations.  Defendant's ILK scores did not confirm or refute possible malingering.  *Id*.

During Dr. Brannon's evaluation, Defendant was appropriately groomed and could state his

name, date, and location.  *Id.* at 3-4.  Defendant's general presentation was cooperative during the

first appointment and less cooperative during the latter half of the second appointment. Defendant's eye contact was direct and unremarkable, his memory function was intact, and his attention span was within normal limits. He displayed no major communication deficits. During the latter half of the second appointment, Defendant began to display increasing delays before responding to Dr. Brannon's questions. During these delays, Defendant displayed no behavior or verbalized statements consistent with the presence of a psychotic disorder. He also exhibited no symptoms to suggest active hallucination or delusions. Dr. Brannon found Defendant's conduct to be most consistent with a diagnosis of malingering. *Id.* at 7. Dr. Brannon diagnosed the Defendant with ASD, unspecified mood disorder, and malingering, and ultimately found that Defendant was competent to stand trial.

**D. Additional Evidence of Defendant's Competency**

    **1. Mental Health Records**

Although neither party called mental health providers from the St. Lucie County jail to testify, defense counsel introduced Defendant's jailhouse mental health records from December 7, 2023 to January 18, 2024. Notably, this time frame coincided with Defendant's most recent meeting with Dr. Rapa and two meetings with Dr. Brannon.

On December 7, 2023, Defendant listed Asperger's and "cognitive looping" as past mental health diagnoses and answered that "yes" he had been prescribed medication for emotional or mental health problems but was "inactive" with such medication. DE 73-1 at 19. On December 10, 2023, Defendant presented as "upset and argumentative" and exhibited "delusional thought" and "rambling about unrelated and varied topics." *Id*. at 25. On December 13, 2023, Defendant's mental health was noted as "unstable." *Id.* at 26. As of December 14, 2023, Defendant was taking the psychotropic medication lithium carbonate. *Id*. at 30. At the time, Defendant appeared disoriented with visual and auditory hallucinations and slowed speech. *Id*. at 30-31.

On December 25, 2023, four days after he met with Dr. Brannon and seemed fine, Defendant reportedly told staff he was having suicidal ideation and was put on watch. *Id*. at 35. On December 26, 2023, during a suicide watch evaluation, Defendant stated "the voices in my head tell me to kill myself." *Id*. at 40. On December 27, 2023, after being woken up by security for an assessment, Defendant was agitated, refused to make eye contact, and denied suicidal ideation. *Id*. at 43. The provider at the time found insufficient evidence to move Defendant to a mental health dorm. *Id*.

On December 30, 2023, Defendant reported "ongoing voices in his head" and that he and the voices have been working together, but he was observed as being appropriately responsive and engaging. *Id*. at 44. While the provider believed some of Defendant's responses evidenced delusions or hallucinations, she ultimately believed he was stable because he made direct eye contact and answered all questions asked of him. *Id*. On January 1, 2024, Defendant continued to report auditory hallucinations, but the "voices" did not appear to command or harm him. *Id*. at 47. A week later, on January 8, 2024, Defendant self-reported "cognitive struggles," but denied those issues interfered with his functioning. *Id*. at 50. Defendant continued to present as "bizarre," specifically, his speech patterns, lack of eye contact, and social cues. *Id*. On January 10, 2024, Dr. Brannon met with Defendant and found him appropriately groomed and generally cooperative. Govt. Ex. 2. A week later, on January 18, 2024, Defendant was seen by a facility provider who described him as being "calm, alert and cooperative" and in no apparent distress. DE 73-1 at 51.

### 2. Erica Warren's Testimony

Defendant's mother, Erica Warren, provided the following testimony. Defendant was "a little different" than her other boys before going to jail. Tr. 129. Around 14 or 15 years old, Defendant's mental stability began to change and he was ultimately diagnosed with Asperger's disorder. *Id*. at

130.  Defendant was interested in video games, anime, and cosplay.[2]  Ms. Warren testified that since

his incarceration, her son is more disconnected, does not make sense sometimes, and she has "to bring

him back to reality." *Id*. at 133.  When asked about Defendant's various supernatural rantings, she

responded "[h]e has a cosplay type of mind, like thinking about the anime characters, and he does

tend to emulate.  He has always." *Id.* at 135.

Defendant corresponded with Ms. Warren while he was in jail.  This written correspondence

consisted of fantastical stories concerning mythology, notations on astrological signs, corresponding

charts, and incoherent ramblings.  DE 73-1 at 54-70; Def. Ex. 15.  Ms. Warren testified that within

the letters she received from her son, "there is[sic] no like written notes or messages.  It is just all

drawings and ideas." Tr. 132; Def. Ex. 15.

### 3.  Kyle Alders' Testimony

Defendant's brother, Kyle Alders, also testified.  Mr. Alders last spoke to Defendant on the

phone on April 10, 2024, where initially they discussed artificial intelligence and technology.  Tr.

142.  Mr. Alders testified that eventually on that call, Defendant began to speak of visions and dreams

and seemingly could not distinguish between the two.  *Id*.  Specifically, Defendant described "visions

that beings were taking parts of his body and walking away with them." *Id*. at 142.

### <u>ANALYSIS</u>

The Fifth Amendment's Due Process clause prohibits the government from trying a mentally

incompetent defendant.  *See* U.S. Const. amend. V; *U.S. v. Rahim*, 431 F.3d 753, 759 (11th Cir.

2005) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)); *see also Indiana v. Edwards*, 554 U.S.

164, 170 (2008) ("[T]he Constitution does not permit trial of an individual who lacks 'mental

competency.'").  A defendant is incompetent if (1) he is presently suffering from a mental disease or

---

[2] Anime is a genre of Japanese cartoons that typically involve fantasy themes and stories. Cosplay is the practice of
dressing up as a fictional character, often times as an anime character.  *Id*. at 136.

defect that results in his (2) inability to understand the nature and consequences of the proceedings against him or (3) to assist properly in his defense.   18 U.S.C. § 4241(d).   The competency determination asks "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."   *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995) (quoting *Dusky v. U.S.*, 362 U.S. 402 (1960)).

"Not every manifestation of mental illness demonstrates incompetence to stand trial" and it is well settled that bizarre, volatile, or irrational behavior, or being prescribed psychiatric drugs, do not amount to incompetency to stand trial.   *Medina*, 59 F.3d at 1107.   Similarly, neither low intelligence nor mental deficiency can be equated with mental incompetency.   *Id.*; *Pardo v. Sec'y, Fl. Dep't of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009) ("Absent evidence of such an inability [to assist counsel or understand the charges], evidence of low intelligence, mental deficiency, bizarre, volatile, or irrational behavior, or the use of ant-psychotic drugs is not sufficient to show incompetence to stand trial.").   Rather, a court must evaluate the nature and extent of the defendant's impairment to determine its impact.   The test is whether the evidence shows "a present inability to assist counsel or understand the charges."   *Medina*, 59 F.3d at 1107.

A petitioner "is entitled to no presumption of incompetency and must demonstrate his … incompetency by a preponderance of the evidence."   *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 481 (11th Cir. 2012) (*quoting James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992)).   A court faced with conflicting expert testimony does not clearly err by crediting one opinion over another where other record evidence also supports the conclusion.   *Battle v. U.S.*, 419 F.3d 1292, 1299 (11th Cir. 2005); *see also Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

The experts agree—and I find—that Defendant has autism spectrum disorder, but autism does not render him incompetent to proceed.  However, that is where the parties' agreement ends.  Defendant maintains that, in addition to autism, Defendant has psychosis resulting from schizophreniform disorder, which renders him unable to understand the proceedings or assist properly in his defense.  The Government responds that Defendant does not have psychosis or schizophreniform disorder and is instead malingering to avoid moving forward in this case.  That raises the central questions of this case:  Did Defendant suffer a psychotic break before he was set to change his plea that left him so severely plagued by delusional thinking and hallucinations that he is incompetent to proceed?  Or is Defendant competent and simply malingering in order to—in his own words – "play the mental card?"  To answer these questions, I must weigh the opposing reports of Dr. Rapa and Dr. Brannon in light of the other record evidence.  I must also consider the degree to which the evidence shows that Defendant has a rational as well as factual understanding of the proceedings against him and a sufficient present ability to consult with his counsel.  I will consider each of these issues in turn.

**A. I do not Credit Dr. Rapa's Testimony that Defendant has Schizophreniform Disorder and is Incompetent to Proceed.**

Although she previously found him competent to proceed, Dr. Rapa testified that when she met with Defendant for a third time on November 24, 2023, "[t]he Mr. Hulten that walked into the room to meet with [Dr. Rapa] was not the same Mr. Hulten that [she] had seen the last two times." Tr. 154.   For instance, Dr. Rapa reported that Defendant appeared dirty/disheveled, was trembling/pacing back and forth, and carried a journal with bizarre ramblings, including about his court case and astrology.  *Id.* at 155.  He told Dr. Rapa that he was John the Baptist, that he had special powers, and that he could predict the future.  Dr. Rapa described Defendant's speech as:

> [e]xtremely rapid throughout the two and a half hours, not a break for me to get him to stop talking.  For me to ask something, was extremely

> difficult. Pulling him back on task was extremely difficult, and even if
> he was back on task for a little while, he would slip right back in to
> talking about his delusions.

*Id.* at 156.

As described above, Dr. Rapa administered a series of tests and found that Defendant fell

within the "markedly ill range" in terms of the severity of his schizophrenic symptoms, demonstrated

"low insight into his psychotic processing," and demonstrated no evidence of malingering.  DE 73-1

at 11.  At the hearing, Dr. Rapa emphasized her certainty that Defendant was not faking his symptoms:

> When he was with me, there was no way that this was faked.  I don't
> think a human being in their rational logical mind could even make up
> what he was saying and how he was saying it, and how he would jump
> from topic to topic.  To me it was absolutely legitimate whether it was
> a brief psychotic episode or mania, but it was legitimate, that two hours
> and a half were exhausting.

Tr. 158.

Dr. Rapa was unsure if what she was seeing was "just mania," or "a first episode psychosis,

somebody that was just really having a psychotic break." *Id.* at 157.  She ultimately diagnosed

Defendant with schizophrenia lasting less than six months and concluded Defendant was not

competent to proceed based on his severe psychotic symptoms.  Def. Ex. 3 at 9.

I do not credit Dr. Rapa's opinion that Defendant has psychosis which renders him

incompetent for several reasons.

First, there is no evidence showing that Defendant has ever exhibited psychosis or

schizophrenia before November 2023 or after December 2023.  Dr. Rapa saw no evidence of

delusions, hallucinations, or psychosis of any kind from Defendant when she observed him during

her first two evaluations.  Dr. Smith similarly saw no psychotic symptoms during her evaluations or

while Defendant was under observation over several months at BOP's facility in California.  Dr.

Brannon saw no evidence consistent with genuine hallucinations or delusions.  The record is devoid

of evidence that Defendant has a history of schizophrenia or ever exhibited psychosis prior to his April 2022 arrest. Dr. Rapa could not explain to this Court's satisfaction how Defendant could be competent throughout most of this proceeding (which has been pending for more than two years), then incompetent immediately before the time to plead guilty, and competent (but faking) a month later with Dr. Brannon. When asked about this, Dr. Rapa could only speculate:

> [M]ental health issues can get worse and then go away and remit, and then get worse … with schizophreniform, sometimes what we see if they have active symptoms of psychosis for a few months, then it goes away, no one knows why. Sometimes medication helps. …Sometimes it just goes away on its own and no one explains why. Some of those people go on to have other episodes, some don't. I can't explain that other than there are times when people do not have significant symptoms, even if they have the diagnosis.

Tr. 179-80. While Dr. Rapa's point is certainly true in *some* cases, those are not the facts present here. In this case, there is no evidence that Defendant has psychosis which waxed and waned throughout his life or this case, or that was caused or resolved by medication. When the time came to plead guilty, his symptoms seemed to appear out of the blue and resolved just as quickly. Although the jail records show odd behaviors during that time frame, no medical professional at the jail diagnosed him with schizophrenia or moved him to a mental health ward based on his behavior.

Second, Defendant met with Dr. Brannon about a month after he met with Dr. Rapa and did not display the bizarre ramblings and behavior Dr. Rapa had seen; instead, objective testing revealed that Defendant was malingering. During his meetings with Dr. Brannon, Defendant knew the charges against him, the penalties, the role of the prosecution, defense, judge, and jury. Defendant was appropriately groomed and could state his name, date, and location. Govt. Ex. 2 at 3-4. He demonstrated good eye contact, intact memory function, normal attention span, and appropriate volume, pacing and word production. He displayed no communication deficits, no motor impairments, and no behaviors or statements consistent with the presence of delusions, hallucinations,

or psychosis. During the latter half of the second meeting, Defendant began displaying increasing delays before responding to Dr. Brannon's questions, but still did not exhibit any behavior or verbalize any statements consistent with the presence of a psychotic disorder.

Dr. Brannon found Defendant's conduct to be most consistent with a diagnosis of malingering. *Id.* at 7. I credit this conclusion, which was confirmed by objective testing. As described above, Dr. Brannon administered multiple screening assessments and Defendant's scores indicated malingering and an attempt to "fabricate symptoms of a mental health disorder" rendering certain scores "not interpretable." *Id.* at 4-5.

By Dr. Rapa's own admission, she could not provide thorough testing because she found Defendant's behavior too bizarre and his responses incoherent. Tr. 161. While the jailhouse mental health records suggest a sudden onset of symptoms in December 2023, just as quickly, those symptoms dissipated, and Defendant behaved normally by the time Dr. Brannon saw him on December 21, 2023. Defendant's presentation to Dr. Brannon was inconsistent with the symptoms he displayed to Dr. Rapa, and I agree with Dr. Brannon that Defendant's symptoms of psychosis had an "unrealistically rapid onset." Govt. Ex. 2 at 7. How rapidly these symptoms came and went further validate Dr. Brannon's opinion that Defendant was malingering.

Third, even Dr. Rapa agrees that Defendant was exaggerating his symptoms and trying to manipulate the system when he met with Dr. Brannon. After reading Dr. Brannon's report and listening to his testimony, Dr. Rapa agreed that Defendant was lucid, competent, and actively malingering during Dr. Brannon's evaluations. Tr. 161, 166, 179, 184-86. Dr. Rapa's agreement with Dr. Brannon on these points is powerful evidence of Defendant's competence because it means Defendant has actively malingered and tried to "play the mental card" during these proceedings, and Defendant was competent during his most recent evaluations of record. Considering Dr. Rapa's

agreement with Dr. Brannon on this point, it is difficult to conclude that Defendant is presently incompetent to proceed to trial.

Fourth, Defendant's malingering symptoms are entirely consistent with his initial recorded jail phone call to his mother in which he told her he needed to "play the mental card." The recorded calls (which the parties did not play but which were described by the experts in court) demonstrate that from the day he was arrested, Defendant understood the seriousness of the charges, the time he is facing, the type of lawyer he wanted and why, and the impact that mental health could have on these proceedings. The phone calls are strong evidence that Defendant's bizarre behavior with Dr. Rapa and his odd rantings and writings in his journal and letters are a contrived and intentional attempt to avoid moving forward in this case. While the 18-month gap between the phone calls and appearance of psychotic symptoms is not insignificant, it appears that Defendant first tried to play the mental card based on his historic diagnosis of autism, and when that was unsuccessful, he began displaying psychotic symptoms to his lawyer, Dr. Rapa, and others at the jail instead of changing his plea or proceeding to trial. He continued feigning symptoms when he met with Dr. Brannon, giving rational answers to non-legal questions and irrational answers to legal questions, but objective testing shows he was malingering. Accordingly, I credit Dr. Brannon's findings over those of Dr. Rapa and find Defendant is not presently suffering from a mental disease or defect that renders him competent to proceed.

## B. Defendant is Able to Understand the Charges Against Him.

The weight of the evidence demonstrates that Defendant understands the nature and consequences of the proceedings against him. Dr. Smith and Dr. Brannon's evaluations show conclusively that Defendant accurately understands the charges, the possible penalties, the roles of others in the court system, and the legal process. With Dr. Smith, Defendant discussed the charges and his conduct in a rational and coherent manner. Govt. Ex. 1. Defendant told Dr. Smith that he

was arrested for "a sex offense" and was charged with "enticing and production and distributing." He defined enticement as "asking someone underage to do something for you sexually or do something sexually." He explained child pornography as "recording engaging in sexual acts with underaged females." He knew his charges were felonies, identified the potential sentence he was facing, and correctly defined please of guilty, not guilty, and guilty by reason of insanity. He accurately explained the plea bargain process and was able to define probation, even identifying possible conditions of probation to which he could be amenable. He understood the roles of various court participants, including defense attorney, prosecutor, judge, witness, jury, and defendant. He understood that as a defendant, he should let his lawyer speak for him because anything he said could be used against him. Defendant was similarly able to explain his charges and various aspects of the court system to Dr. Brannon. Defendant told Dr. Brannon he could get 15 years to life, or possibly 10 years to 30 years, in prison for his pending charges. He knew he could not receive the death penalty, and he was able to accurately define probation and house arrest. Defendant was able to accurately define the roles of judge, defense attorney, prosecutor, and witness.

Dr. Rapa initially opined that Defendant did not understand certain legal concepts relevant to his case due to his autism and lack of experience, but those conclusions were not supported by the evidence. For example, when Defendant first met with Dr. Rapa in June 2022, he claimed not to know the range and nature of the penalties that could be imposed if he was found guilty. Def. Ex. 16 at 5. But two months before that he told his mother on a jail call that he was "probably gonna be [in jail] the rest of [his] life." When he first met Dr. Rapa, he also claimed not to know the meaning of a plea bargain. Yet, a few months later, without any competency restoration with an autism professional, Defendant explained to Dr. Smith the different types of lawyers: some will fight for you at trial, others will get you a plea, and others will let you "sit on your ass and you can burn."

Defendant also claimed to Dr. Rapa that he did not know the meaning of a jury, but he was able to explain the role of a jury to Dr. Smith and Dr. Brannon.

Notably, Dr. Brannon observed that although Defendant provided *unusual* responses when he was asked legally relevant questions, he was able to provide *rational and relevant* answers when discussing non-legal matters. This suggests Defendant understood the questions but was trying to give nonsensical or illogical answers. For example, when asked to define "guilty" and "not guilty," Defendant gave their opposite meaning, stating that "guilty" means "you didn't do it," and "not guilty" means "you did do it." Defendant claimed not to understand the meaning of "no contest." Although the examiner explained it twice, Defendant refused to respond before finally saying "no contest" means "the prosecutor gives up." When asked the definition of a trial, Defendant said "love." When asked the definition of evidence, Defendant responded "what they don't have against you." I agree with Dr. Brannon that these answers are more consistent with malingering than a true lack of understanding. The evidence shows Defendant has a factual understanding of the proceedings against him. *See U.S. v. Merriweather*, 2014 WL 5770213, at *62 (N.D. Ala. Nov. 5, 2014) (defendant had factual understanding of the proceedings against him where he was able to recall the facts of the offense, identified the roles of judge, prosecutor, and defense, was aware of the insanity defense, and understood the meaning of a guilty plea); *U.S. v. Verdino*, 2010 WL 1979428, at *1, 6 (N.D. Ill. May 14, 2010) (finding defendant, who was diagnosed as a low functioning, special needs adult with limited cognitive abilities, had a basic factual understanding of the proceedings where he was able to learn the roles of the judge, prosecutor, and defense attorney, and understood the crime he was charged with, the wrongfulness of his alleged conduct, and was able to behave properly in a public forum); *U.S. v. Salley*, 246 F. Supp.2d 970, 976 (N.D. Ill. 2003) (defendant with a delusional disorder had a factual understanding of the legal process when he knew the roles of courtroom personnel, the purpose and process of a trial, and available plea options).

I further find that Defendant has a rational understanding of the proceedings against him. "A defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1992). As discussed above, I do not credit Dr. Rapa's conclusion that Defendant has any form of psychosis or schizophrenia which would prevent him from accurately perceiving and understanding the world around him. On the contrary, Defendant has exhibited an ability to respond appropriately to his surroundings.

**C. Defendant is Able to Consult with Counsel and Assist in his Defense.**

The evidence demonstrates that Defendant is well able to consult with his counsel about his case. The evaluations of all three experts confirm this.

Dr. Smith found that Defendant was competent in several key areas relevant to his ability to communicate. DE 69-1 at 16. Defendant was an adequate historian of his background information when interviewed by Dr. Smith and her team. He showed no difficulty communicating with others about his case and pertinent factors. Defendant's jail calls while at MDC-LA confirmed his ability to communicate about his case and other matters without difficulty. Defendant engaged in appropriate reciprocal conversation, primarily discussing his well-being, money in his inmate commissary account, his daily activities, the ongoing forensic evaluation, and the current legal situation. Govt. Ex. 1 at 8-9. His verbal behavior on the phone calls was coherent, clear, goal directed, and without delay. He demonstrated no difficulty communicating, using average grammatical complexity while discussing various topics across multiple calls and days. His speech was within normal limits, was consistently fluid, his tone and volume were normal. The content of his speech did not reflect odd symptoms, psychosis, or cognitive impairment. While talking, he demonstrated fully intact orientation and ability to follow the content of the recipient's speech. His mood was euthymic, with congruent affect, including laughter as appropriate. *Id.* at 9. His communication style was not

indicative of someone who suffered from signs or symptoms of a major mental health disorder such as bipolar or schizophrenia. *Id.*

Defendant told Dr. Smith he was "willing to cooperate with an attorney and to assist in his defense." *Id*. at 17. He expressed "an understanding he is expected to divulge all information to his attorney, and he did not anticipate difficulty telling his attorney everything." *Id*. Specifically, he knew he could assist his attorney by "being honest and provided information he needs." *Id*. at 17. He understood the concept of confidentiality with legal counsel. He also understood that he should let his attorney speak for him in court because anything he said could be used against him. In fact, Defendant understood the role of the defense attorney so well that he expressed reservations about whether his appointed lawyer "knew enough about mental health on how to defend my case." Defendant wanted to know what his lawyer had learned about Aspergers and wanted the lawyer to "go through some scenarios" with him about how his mental issues could be used for his defense. *Id.* Defendant explained to Dr. Smith that there are three types of lawyers: those who fight for their client at trial, those who are good at negotiating pleas, and those who let you "sit on your ass and watch you burn." He suspected his lawyer was of the plea negotiating variety. Defendant's concerns mirror his initial comments to his mother when he was first arrested about playing the "mental card" and needing a private attorney. Govt Ex. 2 at 7 (Defendant stating "I don't think I need a public defender. I need more of a private attorney… No one for free is going to do anything. … A public defender isn't going [sic] help much … unless we got blessed with the best public defender in the world."). Defendant's ability to articulate these concerns demonstrates that he understands the severity of his charges, has an opinion on the quality of representation his lawyer can provide, and is able to strategize and consult with his lawyer about whether to plead or go to trial and possible defenses, including those relating to mental health.

Dr. Brannon also concluded that Defendant could communicate effectively and assist in his defense.  Defendant "did not initially display any communication defects" and could describe to Dr. Brannon the charges against him, the penalties, the nature of the legal process, roles of the parties, and his understanding of the evidence.  *Id*.  When Defendant began to provide delayed responses, Dr. Brannon noted he was malingering, which was borne out by objective testing.  *Id*.

Even Dr. Rapa concluded that Defendant could consult with counsel and assist in his defense.  On January 31, 2023, she observed Defendant meet with his attorney, and noted that Defendant demonstrated sufficient understanding of legal factors and asked pertinent questions regarding his case. Def. Ex. 17 at 2.  It was not until the erratic and abnormal behavior Defendant displayed on November 24, 2023 that Dr. Rapa believed Defendant demonstrated mental illness to a such a point that he could not rationally communicate with his attorney to assist in his defense.

Defendant is also able to manifest appropriate courtroom behavior.  Throughout multiple evaluations by the various professionals involved, Defendant never displayed disruptive, aggressive, inappropriate, or unusual behavior prior to November 2023.  Defendant articulated to Dr. Smith an adequate understanding of appropriate courtroom behavior and the challenging of prosecution witnesses.  He discussed procedures such as only speaking out in the courtroom when asked by court personnel; obtaining permission from the court to move about in the courtroom; behaving in a calm and orderly manner; and asking his attorney if he did not understand what a witness was saying or if he wished to challenge a witness.  Defendant remained attentive and engaged throughout the hours of evaluation, and he recognized that similar behavior would be expected of him in the courtroom.  Govt. Ex. 1 at 18.  Defendant also demonstrated an ability to behave appropriately with Dr. Brannon.  He did not display any aggressive or disruptive behavior during their meetings.  Similarly, Defendant has appeared before me in court multiple times and has never been aggressive, disruptive, or shown any manifestations of hallucinations or odd behavior while court was in progress.  On one occasion,

Defendant became disruptive after I left the bench, yelling at the U.S. Marshals to "leave him alone" as they attempted to escort him out of the courtroom.  At all other times, however, Defendant appeared quiet and attentive while court was in progress, displayed a normal demeanor and made generally good eye contact with the court and the witnesses.

**D.  This Court has Sufficient Information and Does Not Require Additional Testing.**

A court may order additional psychological testing if it "desires more information than is otherwise available to it as a basis for determining the mental condition of the defendant...." 18 U.S.C. § 3552(c).  Here, Defendant has undergone extensive testing to date.  He underwent an initial competency examination by Dr. Rapa, a comprehensive three month-long evaluation by Dr. Smith, two additional evaluations by Dr. Rapa, observations by several mental health professionals at the St. Lucie County Jail, and a final evaluation by Dr. Brannon.  Because this Court has ample information from which to determine Defendant's competency, no further evaluation or testing is necessary.

<u>**CONCLUSION**</u>

In sum, Defendant has not shown he is incompetent by a preponderance of the evidence.  First, there is evidence that Defendant is malingering.  Second, I give greater weight to Dr. Brannon's findings and conclusions, as they are more detailed and based on more extensive interviews of and interactions with Defendant over a longer time period.  Third, Defendant did not meet his burden to show Defendant could not assist his counsel or understand the proceedings against him.  Lastly, this Court has sufficient information to evaluate the Defendant and there is no need for further testing. For the foregoing reasons, I find that Defendant is able to understand the nature and consequences of the proceedings against him and has a sufficient present ability to consult with his counsel with a reasonable degree of rational understanding such that he is able to assist in his defense.  Accordingly, I conclude that Defendant is competent.

## **RECOMMENDATION**

Based on the foregoing, it is hereby **RECOMMENDED** that Defendant be found mentally competent to proceed in this case.

## **NOTICE OF RIGHT TO OBJECT**

A party shall serve and file written objections, if any, to this Report and Recommendation with presiding U.S. District Judge Robin L. Rosenberg within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a de novo determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).    **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 26th day of June, 2024.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE