UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14027-CR-ROSENBERG

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

BLAINE HULTEN,

      Defendant.

_____/

## MOTION FOR DOWNWARD VARIANCE AND
## SENTENCING MEMORANDUM

Most people would panic at the thought of their own arrest and a potentially lengthy prison sentence. They would talk about the moments they would miss on the outside, how terrible things are in detention, and how they wish things could be different. Blaine Hulten is not most people.

Sitting in jail, facing the prospect of spending the rest of his life in prison, Blaine fixated on one thing: Pokémon. Pokémon is a Japanese media franchise consisting of video games, an animated series and films, a trading card game, and other related media, designed for children between ages 5 and 12. It takes place in a shared universe in which humans co-exist with creatures known as Pokémon, a species endowed with special powers.

Blaine's mother, Erika, recalls his fixation began when he was just six or seven years old, after his older brothers gifted him the collection of Pokémon paraphernalia they had outgrown. From that point forward, Blaine collected everything Pokémon-

related. Every Christmas and birthday gift was Pokémon. He had every playing card, video game, action figure, and stuffed animal he or Erika could find. He watched every Pokémon television show and every Pokémon movie. Blaine learned everything there was to learn about Pokémon. He even taught himself how to draw the characters.

Weeks into his confinement, Blaine's obsession continued to override any concerns he might have about a future prison sentence. He fixated on a video game console he thought law enforcement confiscated as part of their investigation. He had spent hours, days, months on that console, developing his Pokémon profile and character. That console housed Blaine's opus and, in the hands of law enforcement, his life's work was in danger of destruction. Blaine pleaded with his mother to find a way to have it returned intact.

Throughout his three years of incarceration so far, Blaine has repeatedly returned to Pokémon in conversations and communications with his mother. He has tasked her with locating and providing him myriad information about the newest characters and developments in the franchise. To Blaine, those requests were urgent, like demands other inmates might have to speak with their lawyer or strategize about their case.

A few months ago, Erika received in the mail a Pokémon board game Blaine created at the jail that he and the other inmates played to pass the time. When he learned of his pending transfer to another jail, he sent it to her for fear it would be

lost, stolen, or taken by jail officials. To Blaine, there is nothing more important than Pokémon.

**Blaine is not like the other kids.**

Blaine's fixations make him weird to other people. He obsesses over things like Pokémon, Lego, anime, video games, foreign coins, and all things miniature. He learns everything there is to know about his fixations and then talks about them incessantly with anyone who will listen. If someone does not listen, he waits patiently as he stares at them until they do.

As a child, Blaine refused to eat any chocolate bar not Hershey's, any ice cream not mint chocolate chip, and any milk not chocolate; he ate only chicken nuggets with barbeque sauce, peanut butter and raspberry jelly sandwiches, and spaghetti with butter – never sauce. Though he expanded his palate slightly as he reached his late teens, his food fixations largely remain to this day.

When he was about five years old, doctors diagnosed Blaine with Vitiligo, an autoimmune disease that causes patches of skin to lose color and usually affects adults. Erika found a peer group of similarly affected children so Blaine could feel normal and, as part of that group, he had the opportunity to "make a wish come true." Obsessed with baseball, he wanted to meet the Tampa Bay Rays, a professional baseball team; but when the time came to meet his favorite players and throw out the first pitch, Blaine was uncontrollable. The other parents thought he was "just spoiled." In reality, the sounds and chaos of the large crowd caused him sensory overload that was simply too much for Blaine to handle.

Blaine believes everyone he meets is his best friend. He even describes inmates he knows only from his time in jail as his "friends." As a child, he would obsess over his newest friends trying to spend every moment with them and even leaving his toys at their homes so he would have to return. Invariably, after a few months, the other kids started making excuses for why they could not hang out with him, and Erika would have to convince Blaine to stop calling them. "If they want to be your friend, Blaine, they will call you." He just could not understand what happened.

**Erika eventually learned why Blaine was so weird.**

When a girl in high school told Blaine she loved him and later broke up with him, he completely unraveled. He cried constantly and followed her around asking her to explain why she did not love him anymore. He hit his head against the wall and carved her name on school property. His extreme emotional reaction eventually caused school officials concern, and they asked Erika to remove him from classes, place him in a homebound program, and find him some help. That was when Dr. Christopher Kye – a board certified child psychiatrist – diagnosed Blaine with Autism. He was 16 years old.

**Autism explained so much about Blaine.**

Autism is a lifelong neurodevelopmental disorder that affects how people interact with others, communicate, learn and behave. For Erika, autism explained so much about Blaine. It explained why he did not talk until he was five years old and experienced similar delays walking and toilet training – he still sporadically wet his bed even a few months before his arrest. It explained his sensory overload at the

baseball game, his extreme overreactions to breaks in routine and break-ups with his short-term girlfriends, and his fixations on things like peanut butter and raspberry jelly sandwiches and Pokémon.

Autism explained his literal-mindedness and his gullibility. Blaine once gave his new "best friend" $300 because a man he had just met told him he was an entrepreneur who needed a loan to pay some bills. Blaine was certain the man would pay him back, but he never did. Another time, while working at a restaurant, Erika had to explain that when his boss told him to wipe everything down, he expected Blaine to use a different rag to clean the tabletops than the one he used to clean the garbage cans. His boss did not specify, so Blaine did not know. Then, there was the time Blaine worked at the warehouse and thought "clocking in when he started work" meant he should only clock in when his supervisor gave him something to do, not when his shift started, which almost got him fired for "being late."

Autism explained Blaine's inability to understand social cues and process social context or sarcasm – like the day at his warehouse job when he walked between two coworkers who were having a conversation. One of them sarcastically exclaimed, "excuse me," and Blaine matter-of-factly responded, "it's ok, you're not in my way." He had to ask his mother why his coworkers were so rude to him the rest of the day. Nor could he understand why, on a different occasion, his boss sent him home when he persistently and repeatedly complained to everyone in the warehouse about the coworker that ate his leftover pizza.

Autism also explained Blaine's lack of empathy. Blaine was very close with his great-grandmother. She would eat fruit with him daily and watched him play games. When she lived with Blaine, she would sleep next to him and they would pray together every night. Yet, when she passed, Blaine did not react. He did not cry or say anything until years later when Erika moved the family from Lantana to Fort Pierce. "Grandma would love it here," was all he ever said.

Blaine is not weird. He is autistic.

**Blaine just wanted to be like everyone else.**

For years, Blaine was stable – living with Erika and her husband, Tim, taking his medications, and trying to hold a job. That changed when a neuro-divergent, family friend told a 20-year-old Blaine she had stopped taking her meds and he wanted to try it too. He wanted to be normal.

As Erika explains it, Blaine was "out-of-his-mind" and refused to listen to either her or Tim. They watched his personality rapidly change. He stopped answering his mother's phone calls and he was staying out until all hours of the night. Blaine had never used profanity – he would apologize immediately if he said the word "hell" – but suddenly it was "f" this and "f" that. He was spending nights at a local Kava bar and using a stimulant called Kratom. When his behavior became too much, Erika and Tim told him he had to either start taking his medications or leave. Blaine left.

By the time these crimes occurred a few months later, Blaine was 21 years old, still unmedicated and living in his car. He started spending time at a local park. His

new "best friend," a 16-year old boy who also hung out at the park, introduced him to the other teenagers, and now Blaine had a whole group of "best friends." He was the older kid with the driver's license and a car and he felt important. He felt normal.

Blaine is not a pedophile. Law enforcement found no evidence he trolled pedophilic chatrooms or searched for child pornography online. None of the experts evaluating him diagnosed him as such, or even diagnosed paraphilia (sexual deviance). As an outcast who had spent his entire life facing rejection by same-age peers, he had found a peer group in that park that did not reject him and with few other options, he accepted them too.

**Blaine's autism will make his time in prison more difficult.**

On the outside, Blaine's autism made him weird. It drew looks from strangers and made lasting friendships with new kids nearly impossible. It meant Erika had to buy extra raspberry jelly or search for the latest Pokémon card. It meant explaining to other parents his extreme emotional responses or finding a therapist to help him cope with an unexpected break-up. It meant helping Blaine understand that not everyone he meets is his new best friend.

In prison, Blaine's autism will make him vulnerable not only to other inmates, but to over-correction by undertrained personnel. For any inmate, prison is a constantly changing environment that is both threatening and unpredictable, but Blaine's social and communication deficits will "make it difficult for [him] to successfully cope with the complex situations that exist in the prison setting." *See*, Characterization of Autism Spectrum Disorder Inside Prison, Marc Peraire, Paricia

Cantos, Maria Sampedro-Vidal, Lucia Bonet-Mora, and Francisco Arnau-Peiro, REvista Espanol de Sanidad Penitneciaraia, p. 33,  2023 Mar 31; 25(1):30-39, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC10236914/pdf/2013-6463-sanipe-25-01-30.pdf. Autistic inmates do not "understand formal and informal social hierarchies, and find it difficult to interiorize rituals and routines imposed by others." *Id.* Blaine, like other autistic inmates, will be more vulnerable to "intimidation, exploitation, confrontations, anxiety and social isolation." *Id.*

Recently, Drs. Eric Imhoff and Kimberly Spence conducted an extensive, multi-day forensic psychological evaluation of Blaine to confirm his autism diagnosis, assess its impact on his criminal behavior, and offer alternatives to lengthy incarceration that would reduce the likelihood he will reoffend. *See* Ex. A (filed under seal). These experts,[1] who specialize in autism and sexual offenses, explained:

> Due to his Central Coherence deficits, including social naiveté, Blaine is currently at significant risk of becoming a victim of abuse within a jail or prison setting. As a result of his pragmatic communication challenges, social skill deficits, poor sense of identity, and gullibility, he struggles to understand non-verbal cues (gestures, expressions, body language, etc.) from others. Individuals with ASD such as Blaine, have difficulty quickly processing the subtleties of verbal and non-verbal communication and face extreme challenges navigating social interactions which leads to passivity, manipulation by others, and an inability to effectively defend themselves. In a jail or prison setting where social hierarchies and power/control among inmates plays an important role in survival, a socially challenged individual such as Blaine would be an easy target for physical and sexual abuse.

Ex. A. at 23.

---

[1] *See* Ex. B.

Neither BOP staff nor other inmates will likely have experience necessary to understand Blaine's neuro-divergent needs. (Characterization, p. 36). Other than BOP psychologists, who do not typically have regular encounters with an inmate, the BOP has no screening tools to identify autistic inmates nor does it offer training to its staff to help them identify or otherwise deal with them. Nor can we expect other inmates to understand the difficulties someone like Blaine has with processing social cues or sarcasm.

Blaine's first trip to the dining hall could be instructive. The typical dining hall in prison contains bright lights, inmates shouting at each other, and guards barking orders. For Blaine, who struggled with the bright lights and roar of the crowd at a baseball game, the environment will be unusually stressful. Inmates segregate themselves by race, gang affiliation, religion, and sex offender status. Choosing the right place to sit can be daunting for neuro-typical inmates, but for someone like Blaine, who could not process his coworker's obvious sarcasm when he stepped between them, it could be catastrophic.

Imagine his fellow inmates' reactions when Blaine unwittingly walks between them and then dismisses their sarcasm as a sincere apology or when he incessantly complains to guards and other inmates alike that someone stole his food. *See also*, "Correctional Management and Treatment of Autism Spectrum Disorder," Isabella Michna and Robert Trestman, Journal of the American Academy of Psychiatry and the Law Online June 2016, 44 (2) 253-258 (describing vignettes of an autistic person's interactions with the prison environment), available at

https://jaapl.org/content/44/2/253. As one Palm Beach County Jail inmate, who attacked Blaine about a year into his incarceration, so eloquently explained it, "snitches get stitches." *See* Ex. C.

**Incarceration has already broken Blaine once.**

Jail has been difficult for Blaine. In addition to another inmate assaulting him, Erika has repeatedly received requests from Blaine for her to add money to his commissary account so he could "share" that money with other inmates. She believes extortion was at play. Then, in October 2024, undersigned counsel visited Blaine at the Palm Beach County Jail and observed behavior he had not previously seen. As undersigned attempted to discuss plea paperwork, Blaine described being able to read people's minds and explained connections between astrology, religious figures, and both the prosecutors and his attorney.

When Dr. Sheila Rapa later visited Blaine, she found him "completely decompensated psychiatrically, in an acute stage of psychosis with active delusions and hallucinations" which she detailed in her report. *See* DE 72 at Ex. 2 (under seal). At their meeting, Blaine provided Dr. Rapa with his "journal" which contained more of the same, *See* DE 72 at Ex. 14 (under seal), and his jail records from the same time frame confirm his symptoms during several encounters with medical staff over a month's time. *See* DE 72 at Ex. 3-13 (under seal). His letters to Erika contained similar ramblings and several horoscope clippings from weeks prior with notes on how they proved some of his ideas or pointed to God. *See* DE 72 at Ex. 15 (under seal).

Although there is no clear cause for this break from reality, Erika reports nothing like it had happened before.

**Blaine is going to prison, but he does not belong there.**

Blaine's youth alone mitigates his criminal behavior because youthful offenders lack maturity and have an "undeveloped sense of responsibility" that leads to "impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (invalidating the death penalty for juvenile offenders). Recognizing those qualities "do not disappear when an individual turns 18," *id.* at 574, the Supreme Court has found even a neuro-typical youth's character more "transient and more capable of reformation" than older offenders, rendering "suspect any conclusion [they] fall among the worst offenders." *Id.* at 570; *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) (finding "transient rashness, proclivity for risk, and inability to assess consequences" both lessened "moral culpability' and increased the likelihood that, as the juvenile develops neurologically, his "deficiencies will be reformed.").

Yet, Blaine is not just young. His neuro-divergent brain does not allow him to experience the world the way the rest of us do. He fixates. He misses context and social cues. He sees the world literally and he is gullible. His brain makes him both less culpable – and more vulnerable – than other similarly situated offenders. Still, he faces a mandatory 15-year prison sentence and a guideline range often criticized for its harshness, even for neuro-typical offenders with a fully developed frontal lobe. *United States v. Jacob*, 631 F. Supp.2d 1099, 1114-15 (N.D. Iowa 2009); *see also United States v. Price*, 775 F.3d 828, 841 (7th Cir. 2014) (affirming the district court's

decision to categorically reject the advisory guideline range for the same reasons).
Rather than reflexively applying that guideline range – a range that fails to account
for his either youth or his autism – Blaine and his mom ask this Court consider mercy
instead.

   WHEREFORE Defendant respectfully requests the Court to grant the above-
styled motion.

                    Respectfully submitted,

                    HECTOR DOPICO
                    FEDERAL PUBLIC DEFENDER

                    s/ *Scott Berry*
                    Scott Berry
                    Assistant Federal Public Defender
                    Attorney for the Defendant
                    Florida Bar No. 0525561
                    250 South Australian Avenue, Suite 400
                    West Palm Beach, Florida 33401
                    (561) 833-6288 - Telephone
                    Scott_Berry@FD.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on January 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: <u>*s/Scott Berry*</u>
Scott Berry